IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**BEVERLY ANN HARMON,**

    **Plaintiff,**

v.                                              No. CIV-15-517 LAM

**CAROLYN W. COLVIN, Acting Commissioner**
**of the Social Security Administration,**

    **Defendant.**

# MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff's ***Motion to Reverse and Remand for A Rehearing, with Supporting Memorandum*** (*Doc. 18*), filed November 12, 2015 (hereinafter "motion"). On March 11, 2016, Defendant filed a response (*Doc. 24*) to Plaintiff's motion and, on March 22, 2016, Plaintiff filed a reply (*Doc. 25*). In accordance with 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(b), the parties have consented to have the undersigned United States Magistrate Judge conduct all proceedings and enter a final judgment in this case. *See* [*Docs. 3 and 6*]. The Court has considered Plaintiff's motion, Defendant's response, Plaintiff's reply, and the relevant law. Additionally, the Court has meticulously reviewed and considered the entire administrative record. [*Doc. 17*]. For the reasons set forth below, the Court **FINDS** that Plaintiff's motion should be **GRANTED** and the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") should be **REMANDED**.

## I. Procedural History

On, September 2, 2011, Plaintiff protectively filed applications for Disability Insurance Benefits (hereinafter "DIB") and Supplemental Security Income (hereinafter "SSI"), alleging that she became disabled on August 12, 2011.  [*Doc. 17-7* at 2-3 and 6-17, respectively].  Plaintiff claimed to be disabled due to Long QT syndrome[1] and a left kidney stone.  [*Doc. 17-8* at 5]. Plaintiff's applications, based on her claims of Long QT and kidney stone, were denied at the initial level on October 11, 2011 (*Doc. 17-5* at 2-6), and at the reconsideration level, based on claims of Long QT, kidney stone, anxiety, and panic attacks, on January 12, 2012 (*id.* at 12-18). Plaintiff requested a hearing to review the denials of her applications (*id.* at 19-21), prior to which, her attorney submitted a statement indicating that Plaintiff suffered from sleep apnea, mood disorder/depression, anxiety due to serious chronic illness, and osteoporosis secondary to malabsorption caused by her prior bariatric surgery, in addition to Long QT syndrome and kidney stones (*Doc. 17-9* at 16-18).  Administrative Law Judge Ann Farris (hereinafter "ALJ") conducted a hearing on August 20, 2013.  [*Doc. 17-3* at 28-47].  At the hearing, Plaintiff was present, represented by attorney Michelle Baca, and testified.  *Id.* at 30, 32-43.  Vocational Expert (hereinafter "VE") Thomas A. Greiner was also present and testified (*id.* at 30, 44-46).

On November 14, 2013, the ALJ issued her decision, finding that, under the relevant sections of the Social Security Act, Plaintiff was not disabled through the date of the decision. [*Doc. 17-3* at 13].  Plaintiff requested that the Appeals Council review the ALJ's decision.  *Id.*

---

[1] Long QT syndrome is a disorder of the heart's electrical activity that can cause sudden, dangerous arrhythmias (problems with the heart's rate or rhythm) in response to exercise or stress. https://www.nhlbi.nih.gov/health/health-topics/topics/qt (site last visited on May 11, 2016).

at 8-9. On May 22, 2015, the Appeals Council denied Plaintiff's request for review on the ground that there was "no reason under our rules to review the [ALJ]'s decision." *Id*. at 2-4. This decision was the final decision of the Commissioner. On June 18, 2015, Plaintiff filed her complaint in this case. [*Doc. 1*].

## II.   Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied. *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992)). If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief. *See Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. *Hamlin*, 365 F.3d at 1214; *Langley*, 373 F.3d at 1118.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted); *Doyal*, 331 F.3d at 760 (citation and quotation marks omitted). An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted). While a court may not re-weigh the evidence or try the issues *de novo*, its examination of the record as a whole must

include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citations omitted). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

### III. Applicable Law and Sequential Evaluation Process

For purposes of DIB and SSI, a person establishes a disability when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). In light of this definition for disability, a five-step sequential evaluation process (hereinafter "SEP") has been established for evaluating a disability claim. 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the SEP, the claimant has the burden to show that: (1) the claimant is not engaged in "substantial gainful activity;" and (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and either (3) the claimant's impairment(s) meet(s) or equal(s) one of the "Listings" of presumptively disabling impairments; or (4) the claimant is unable to perform his or her "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i–iv), 416.920(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261. At the fifth step of the evaluation process, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other work in the national economy,

considering his or her residual functional capacity (hereinafter "RFC"), age, education, and work experience.  *Grogan*, 399 F.3d at 1261.

## IV.   Plaintiff's Age, Education, Work Experience, and Medical History; and the ALJ's Decision

Plaintiff was born on January 28, 1967 and was 44 years old on August 12, 2011, the claimed onset of disability date.  [*Doc. 17-7* at 2].  Thus, for the purposes of her disability claims, Plaintiff is considered to be a "younger person."[2]  Plaintiff did not graduate from high school, but did obtain a General Education Development ("GED") certificate.  [*Doc. 17-8* at 6] Prior to her alleged disability, Plaintiff worked approximately 25 years for the City of Albuquerque as a security officer.  [*Doc. 17-9* at 13].

Plaintiff's medical records include:  Hospital treatment records from Presbyterian Hospital for the period from August 7, 2011 through September 8, 2011 (*Doc. 17-10* at 4-12, 20-27); Hospital treatment records from University of New Mexico Hospital for the period from August 13, 2011 through September 23, 2011 (*Doc. 17-11* at 4-47); Treatment records from Inbar Shmuel, M.D. for the period September 7, 2011 through September 30, 2011 (*Doc. 17-12* at 4-37, *Doc. 17-13* at 2-16); Physical Residual Functional Capacity Assessment by Elva Montoya, M.D. dated October 10, 2011 (*Doc. 17-13* at 10-16); Treatment records from Del Sol Bariatric Center for the period from March 31, 2011 through October 28, 2011 (*Doc. 17-14* at 6-29); Consultative examination by Louis Wynne, Ph.D. dated December 9, 2011 (*id*. at 31-34); Medical records from Clinical Research & Osteoporosis Center for the period from

---

[2] *See* 20 C.F.R. §§ 404.1563(c) and 416.963(c) (defining a "younger person" as "under age 50").

January 18, 2012 through May 31, 2012 (*Doc. 17-16* at 4-32); Treatment records from Cardiac Electrophysiology Clinic of University of New Mexico for the period from December 5, 2011 through September 24, 2012 (*Doc. 17-17* at 5-12); Hospital records from Presbyterian Rio Rancho Emergency Department for the period from August 7, 2011 through August 10, 2011 (*id*. at 34-44, *Doc. 17-18* at 2-30); Treatment records from Amy Schmidt, M.D. dated February 12, 2013 and May 28, 2013 (*Doc. 17-18* at 38-39, *Doc. 17-19* at 13-15); and Treatment records from Betsy J. Davis, Ph.D. dated August 2, 2013 and August 8, 2013 (*Doc. 17-19* at 9-11). Where relevant, Plaintiff's medical records are discussed in more detail below.

At step one of the five-step evaluation process the ALJ found that Plaintiff "has not engaged in substantial gainful activity since August 12, 2011, the alleged onset date [of her disability]." [*Doc. 17-3* at 15]. At step two, the ALJ found that Plaintiff has the following severe medically determinable impairments: "malabsorption due to bariatric surgery, status post defibrillator implant for QT syndrome, a mood disorder, and anxiety due to medical condition." *Id.* The ALJ also found that Plaintiff's "medical history also consists of osteoporosis, thrombocytopenia,[3] and obstructive sleep apnea," but that "[t]he evidence of record fails to show that these impairments singly or in combination result in significant functional limitations preventing her from performing basic work activities." *Id*. at 16. At the third step, the ALJ

---

[3] Thrombocytopenia is the condition of having an abnormally low amount of blood platelets, which are parts of the blood that help it to clot. *See* Stedman's Medical Dictionary (27th ed., Lippincott Williams & Wilkins 2000) at 1831. Significantly, in Plaintiff's case, this condition was considered "likely secondary to infection and acute reaction" during her hospitalization for kidney stones and an E-coli infection, which was "expected to correct as she is treated." [*Doc. 17-17* at 38]. In light of this prognosis, and given that the ALJ did not discuss either the symptoms of this condition or how it might affect Plaintiff's functioning, it is difficult to understand why it was considered by the ALJ to be an "impairment." Since she did, however, the ALJ probably should have noted that the condition was expected to resolve on its own, and that Plaintiff received no further treatment for it.

found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the Listings found in 20 C.F.R. Part 404, Subpt. P, Appx. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). *Id.* In reaching this conclusion, the ALJ found "that the opinions of state agency physicians that the [Plaintiff]'s impairments neither met nor equaled the severity of a listed impairment are well reasoned and supported by the evidence of record." *Id.* The ALJ also found that "[t]he severity of [Plaintiff]'s mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06." *Id.* In reaching this conclusion, the ALJ found that Plaintiff's mental impairments caused only mild restriction of both her activities of daily living (hereinafter "ADL") and her social functioning, and moderate difficulty with concentration, persistence or pace. *Id.* at 16-17. Therefore, neither the criteria of paragraph B nor the criteria of paragraph C for those listings were satisfied. *Id.* at 17.

> Before step four, the ALJ determined that Plaintiff had the RFC to:
>
> [P]erform a full range of work at all exertional levels but with the following nonexertional limitations: The [Plaintiff] is limited to simple routine tasks. She should avoid exposure to hazardous conditions in the workplace including unprotected heights and dangerous moving machinery. Additionally, the [Plaintiff] should not be required to drive.

*Id.* In support of her RFC assessment, the ALJ found that Plaintiff's "medically determinable impairments might be expected to cause some of the alleged symptoms," but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." *Id.* at 18.

At step four, the ALJ found that Plaintiff "is unable to perform any past relevant work." *Doc. 17-3* at 20. At step five, the ALJ found that "there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform." *Id.* at 21. This conclusion was based

on the VE's testimony that an individual with Plaintiff's RFC and limitations would be able to perform the requirements of representative occupations such as:  nut sorter (DOT 521.687-086),[4] final assembler (DOT 713.687-018), and motor polarizer (DOT 715.687-090), all of which are considered sedentary, unskilled work.  *Id*. at 45.  Therefore, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act from August 12, 2011 to the date of the decision.  *Id*. at 22.

## V.   Analysis

Plaintiff makes the following arguments in her motion to reverse or remand: (1) the ALJ's RFC finding is unsupported by substantial evidence (*Doc. 18* at 4); (2) the ALJ failed to develop the vocational record properly (*id*. at 5); and (3) the ALJ did not link her credibility finding to substantial evidence (*id*.).  In response, Defendant asserts that the RFC assessment "adequately accounts for all of Plaintiff's supportable limitations," and that "any irregularities in that finding are ultimately meaningless because Plaintiff can perform the jobs identified by the ALJ." [*Doc. 24* at 8].  Defendant also asserts that the ALJ "reasonably concluded that Plaintiff's subjective complaints were nor [sic] fully credible."  *Id*. at 15.  In her reply, Plaintiff contends that the ALJ failed to develop the record regarding Plaintiff's severe and non-severe impairments, and that she failed to include limitations imposed by virtue of her osteoporosis, low body weight, implanted defibrillator, and anxiety.  [*Doc. 25*].

---

[4] "DOT" stands for Dictionary of Occupational Titles.

### A.  The ALJ's RFC Determination

The ALJ must base her RFC assessment on all of the relevant evidence in the record, such as medical history, laboratory findings, effects of treatment and symptoms, including pain, reports of daily activities, lay evidence, recorded observations, medical source statements, evidence from attempts to work, need for a structured living environment, and work evaluations, if any. Soc. Sec. Rep. 96-8p at *5.  "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.,* laboratory findings) and nonmedical evidence (*e.g.,* daily activities, observations)."  *Id*. at *7.  The ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved," and the RFC assessment must always consider and address medical source opinions.  *Id*.  Because the ALJ must consider the whole record, she is prohibited from picking and choosing "among medical reports, using portions of evidence favorable to [her] position while ignoring other evidence."  *Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008) (citation and internal quotation marks omitted).  When there are multiple opinions regarding medical severity and functional ability from different sources, the ALJ must explain the weight given to each source's opinions.  *Hamlin*, 365 F.3d at 1215 (citation omitted).

Plaintiff suffered a series of medical events in 2011.  In May of that year, Plaintiff weighed approximately 189 pounds, and was considered "morbidly" or "severely" obese. [*Doc. 17-14* at 20-21].  On May 24, 2011, she underwent a gastric bypass surgery[5] in order to be

---

[5] Gastric bypass is one kind of "bariatric surgery," which "is an operation on the stomach and/or intestines that helps patients with extreme obesity to lose weight."  Gastric bypass surgery restricts food intake and decreases food absorption, as the stomach, duodenum, and upper intestine are bypassed and no longer have contact with food.

9

able to lose the excess weight. *Id*. at 26-29. The surgery was successful and, by her post-operative follow-up visit on October 28, 2011, Plaintiff weighed 136 pounds. *Id*. at 12. Once recovered from the gastric bypass surgery, Plaintiff went back to work for the City of Albuquerque until she became ill on August 5, 2011. [*Doc. 17-3* at 34; *Doc. 17-17* at 37]. On that date, Plaintiff went to urgent care, complaining of painful urination and lumbar pain. *Id*. She was found to have a urinary tract infection, and was sent home on an antibiotic. *Id*. Plaintiff was experiencing nausea, vomiting, and fever, which continued into the next day. *Id*. On August 7, 2011, Plaintiff went to Presbyterian Hospital's Emergency Room (hereinafter "ER") because "she was nervous about the recent [gastric] bypass and vomiting." *Id*. At the ER, Plaintiff was diagnosed with E-coli bacteria in her urine, and a CT scan of her abdomen and pelvis indicated that she had kidney stones. *Id*. She was admitted to the hospital, and on August 8, 2011, had a ureteral stent[6] placed in her left ureter to allow urine to bypass any stones and flow from her kidney into her bladder. [*Doc. 17-10* at 9-10]. She was given a 14-day course of antibiotics preparatory to ureteroscopic surgery[7] at a later date. *Id*. Shortly after Plaintiff was discharged from Presbyterian Hospital, she experienced an episode of syncope, or temporary loss of consciousness, and was taken to the University of New Mexico Hospital's ER on

---

Thus, one side effect of gastric bypass surgery may be an inability to absorb vitamins and other nutrients normally. http://www.niddk.nih.gov/health-information/health-topics/weight-control/bariatric-surgery-severe-obesity/Pages/bariatric-surgery-for-severe-obesity.aspx#d  (site last visited May 23, 2016).

[6] A ureteral stent is a plastic tube that is placed in the ureter, which is a passageway from a kidney to the bladder, that dilates the ureter to make surgical removal of kidney stones easier. *See* Stedman's at 1912.

[7] Ureteral surgery is performed to clear blockages in the ureter and can take many forms. Ureteroscopic surgery involves use of a laparoscope, which is a small tube with a light and a camera that is inserted through a small incision. http://www.mayoclinic.org/diseases-conditions/ureteral-obstruction/care-at-mayo-clinic/treatment/con-20036801 (site last visited May 20, 2016).

August 13, 2011.  [*Doc. 17-11* at 6].  Also at this time, it was discovered that Plaintiff had a congenital, though previously undiagnosed, heart condition known as Long QT syndrome, which causes irregular heart rhythms and is potentially fatal.  [*Doc. 17-11* at 12-15].  It is treated, in part, by implantation of a cardioverter defibrillator that shocks the heart back into regular rhythm when it becomes erratic.[8]  Plaintiff could not have this surgery immediately due to her E-coli infection, and was discharged with a wearable defibrillator called a "LifeVest,"[9] which is an externally worn device that is intended to perform the same defibrillating function.  [*Doc. 17-11* at 6].  From function reports provided by Plaintiff and her husband in October and November 2011, it appears that they both believe that it is important for Plaintiff to keep her heart rate down because of her Long QT syndrome.  [*Doc. 17-8* at 13-20, 23-30].  On September 22, 2011, Plaintiff had surgery for implantation of her cardioverter defibrillator. [*Doc. 17-11* at 22-25].

Approximately four months later, on January 18, 2012, Plaintiff had a bone density scan at the New Mexico Osteoporosis Center, which revealed that she had "markedly low bone density at all sites measured," and could be considered for "antiresorptive therapy."  [*Doc. 17-16* at 32-33]. On May 9, 2012, Plaintiff had an osteoporosis[10] consultation with a specialist at the Clinical

---

[8] An implantable cardioverter defibrillator is a small device placed in the chest or abdomen, which uses electrical pulses or shocks to help control irregular heartbeats (arrhythmias) that can be life-threatening.  *See* Stedman's at 291.

[9] A LifeVest is worn outside the body to continuously monitor the patient's heart and "detect life-threatening abnormal heart rhythms. If a life-threatening rhythm is detected, the device alerts the patient prior to delivering a treatment shock."  http://lifevest.zoll.com/patients (site last visited May 23, 2016).

[10] Osteoporosis is a condition in which living bone tissue breaks down faster than it is replaced, resulting in weak and brittle bones.  *See* Stedman's at 1285.  Osteoporosis is more likely to occur in people who have

Research & Osteoporosis Center, Inc. to evaluate her skeletal health.  *Id*. at 6-7.  Plaintiff was diagnosed with, among other things, "[m]alabsorption secondary to bariatric surgery with low 24-hour urinary calcium," low body weight, and osteoporosis.  *Id*. at 6.  The consulting doctor noted that Plaintiff's "[f]racture risk is sufficiently elevated that pharmacological therapy to reduce fracture is indicated."  *Id*.  Shortly thereafter, Plaintiff began receiving zoledronic acid intravenously, on a yearly basis, to treat her osteoporosis.  *Id*. at 5.

Plaintiff testified that, since these events, she has become increasingly anxious about her health.  [*Doc. 17-3* at 34-35].  She began going to counseling for her anxiety in July 2013 on the advice of her primary care physician.  *Id*. at 37.  At the time of the hearing, Plaintiff indicated that she feels slow and sluggish every day (*id*. at 41), that she is "afraid of everything," (*id*.), that she was still losing weight and was told to "figure out a way to start gaining weight" (*id*.), that she still "quite often" gets lightheaded and feels like she is going to faint (*id*. at 42), and that she gets a "lightning bolt" pain if she lifts too much on her left side (*id*.).

In this case, the only medical opinions in the record are from Disability Determination Services (hereinafter "DDS") doctors:  at the initial level--non-examining expert Elva Montoya, M.D. (*Doc.17-13* at 10-16) and examining expert Louis Wynne, Ph.D. (*Doc. 17-14* at 31-34); and at the reconsideration level--non-examining experts Lawrence Kuo, M.D. and Catherine Nunez, Ph.D. (*Doc. 17-4* at 7-26).  None of Plaintiff's treating doctors provided an opinion regarding the limiting effects of her impairments.  As the ALJ acknowledged in her decision, both the initial and reconsideration level non-examining doctors concluded that,

---

had gastric bypass surgery because reducing the size of the stomach, or bypassing or removal of part of the intestines, limits the surface area that is available to absorb nutrients, including calcium. http://www.mayoclinic.org/diseases-conditions/osteoporosis/basics/definition/con-20019924 (site last visited May 20, 2016).

physically, Plaintiff was capable of medium exertional work. *See* [*Doc. 17-3* at 20]. At the hearing, however, the ALJ questioned the VE regarding jobs that Plaintiff would be capable of performing using hypotheticals with an exertional level of "sedentary."[11]  *See* [*Doc. 17-3* at 45]. Using that exertional level, the VE testified that Plaintiff would be unable to perform her past relevant work as a security officer, as that job has an exertional designation of "light work."[12]  *Id*. The VE then selected three sedentary, unskilled jobs that he testified someone with Plaintiff's limitations could perform:  nut sorter (DOT 521.687-086), final assembler (DOT 713.687-018) and motor polarizer (DOT 715.687-090), all of which are considered sedentary, unskilled jobs. *Id*.  Inexplicably, despite the experts' opinions and the VE's testimony, and without any explanation, the ALJ determined in her decision that Plaintiff was capable of performing "a full range of work at *all* exertional levels."[13]  *Id*. at 17 (emphasis added).

Defendant asserts that Plaintiff's RFC, which is the foundational basis upon which all disability decisions are made, is not subject to reversal because inclusion of a "sedentary" restriction in the hypotheticals posed to the VE renders any error "harmless."  [*Doc. 24* at 8-9].

---

[11] Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. . . . Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. §§ 404.1567(a), 416.967(a).

[12] Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," and "requires a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §§ 404.1567(b), 419.967(b).

[13] To put this in perspective, medium exertional work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds," whereas the highest exertional rating of very heavy work "involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more." 20 C.F.R. §§ 404.1567(c) and (e), 416.967(c) and (e).  Thus, the ALJ's determination of Plaintiff's RFC includes exertional levels that are more than twice those that the non-examining experts, to whose opinions the ALJ gave "great weight," considered her capable.  *See* [*Doc. 17-3* at 20].

This Court disagrees. The ALJ's RFC is not supported by any medical evidence, and is even contrary to the opinions of the medical experts upon which she supposedly relied heavily. Moreover, neither the RFC determination nor the hypotheticals are specifically tied to the evidence of record, as is required. This Court cannot simply assume from the hypotheticals that the ALJ inadvertently stated the wrong RFC for Plaintiff, nor can it simply adopt one or the other exertional level. It is the ALJ's job to render a decision that is supported by substantial evidence, as well as to state with particularity the evidence in the record upon which she did or did not rely. *Grogan*, 399 F.3d at 1262. The ALJ did neither in this case. Indeed, if the RFC in the ALJ's decision is not what she intended it to be, it is difficult to imagine how such a critical error could not only have been missed by the ALJ but by the Appeals Council as well.

It is well established that hypotheticals posed to a VE must precisely match the impairments set forth in the RFC. *See, e.g., Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991); *Smith v. Barnhart*, 172 F.App'x 795, 800 (10th Cir. 2006) (unpublished); *Edwards v. Astrue*, 2012 WL 1115677, *7 (N.D. Okla. March 29, 2012) (unpublished). However, "the inaccurate hypothetical is not sufficient reason for remand [in this case]. Instead, remand is appropriate because it is unclear what level of jobs the ALJ actually determined [Plaintiff] could perform." *Smith*, 172 F.App'x at 800. Here, the only expert opinions found that Plaintiff was capable of medium work, yet the ALJ found, without explaining her reasoning, that Plaintiff could perform work at all levels, then asked hypotheticals based on sedentary work. This Court will not speculate regarding the ALJ's intent. The ALJ's decision "is not capable of meaningful review because it is internally inconsistent and self-contradicting," and must therefore be remanded. *Hignite v. Shalala*, 25 F.3d 1057, *1 (10th Cir. 1994) (unpublished).

Moreover, Defendant's contention that any error committed by the ALJ in this case was harmless and does not support remand is not well taken. For example, Defendant cites *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) for the proposition that, even if the ALJ's finding regarding Plaintiff's RFC is insufficient, its insufficiencies "do not justify remand because the jobs they [sic] ALJ found that Plaintiff could perform would clearly accommodate the additional limitations Plaintiff contends she had." [*Doc. 24* at 8]. In fact, the *Shinseki* Court was considering the Federal Circuit's handling of Veteran's Administration cases using a framework that "mandates an approach to harmless error that differs significantly from the approach courts normally take in ordinary civil cases." *Shinseki*, 556 U.S. at 407. Specifically, the Court disapproved of the "use of mandatory presumptions and rigid rules rather than case-specific application of judgment" for determining harmless error. *Id*. That is simply not the issue before this Court. Where a reviewing court cannot meaningfully review an administrative decision because it is internally inconsistent, that decision must be remanded for further proceedings. *See Hignite*, 25 F.3d 1057 at *1.

Defendant's citation to Justice O'Connor's concurring opinion in *Bowen v. Yuckert*, 482 U.S. 137, 157 (1987) to support the assertion that ambiguity between the ALJ's RFC and the hypotheticals need not be resolved here, is similarly unavailing. [*Doc. 24* at 10]. Justice O'Connor wrote separately in *Bowen* to emphasize that a "facially valid regulation" (20 C.F.R. §§ 404.1520(c), 416.920(c))[14] was being "applied systematically in a manner inconsistent with

---

[14] This regulation, which the majority calls the "severity regulation," states that "[i]f you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work

the [controlling] statute," resulting in a 500% increase in the number of claims denied at step two of the SEP. *Bowen*, 482 U.S. at 157. Noting that "[t]he frustration expressed by the[] courts in dealing with the Secretary's application of step two in particular cases is substantial," Justice O'Connor stated her view that "step two may not be used to disqualify those who meet the statutory definition of disability." *Id* at 158. Justice O'Connor's opinion certainly does not support Defendant's implication that courts should ignore clear ambiguity in an administrative decision, even where it is impossible to determine how much impact those errors may have had on the decision, so long as the Plaintiff cannot establish that her inability to perform jobs selected for her at step five.

By remanding this case, "no particular result is dictated." *Thompson v. Sullivan*, 987 F.2d 1482, 1493 (10th Cir. 1993). However, it must be emphasized that the ALJ has a duty to develop the record in order "to inform [her]self about facts relevant to h[er] decision and to learn [Plaintiff]'s own version of the facts," even where Plaintiff is represented by counsel. *Id.* at 1492 (citations and quotation marks omitted). "Therefore, in addition to discussing the evidence supporting h[er] decision, the ALJ must discuss the uncontroverted evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects." *Grogan*, 399 F.3d at 1262 (citation and internal quotation marks omitted). If there are valid reasons for the ALJ's finding that Plaintiff, a 92-pound woman with significant bone demineralization and an internally implanted defibrillator, has no exertional limitations and, therefore, can even be expected to perform jobs that involve lifting more than she herself weighs (*i.e.*, up to 100 pounds for "very

---

activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience." *Bowen*, 482 U.S. at 141.

16

heavy work"), the ALJ certainly should have expressed them clearly, making sure to discuss all the medical evidence about those conditions. Likewise, she should have stated specific reasons why she rejected the record evidence that Plaintiff's anxiety about her health has rendered her essentially inactive and house-bound. That she did not warrants remand.

### B.  The Vocational Evidence

Plaintiff claims that the ALJ failed to properly develop the record, and therefore failed to provide important information to the VE, regarding limitations to her functionality due to her defibrillator. [*Doc. 18* at 20-22]. Defendant responds that it was Plaintiff's job to present evidence of such limitations, if they exist. [*Doc. 24* at 14-15]. Because this Court has determined that Plaintiff's case must be remanded for further consideration, it is unnecessary to resolve this issue at this time, since the issue may be affected by the proceedings on remand. *See Robinson v. Barnhart*, 366 F.3d 1078, 1085 (10th Cir. 2004) (declining to reach the plaintiff's step five claims because they may be affected by resolution of the case on remand); *Lopez v. Astrue*, 371 F.App'x. 887, 889 and 892 n.6, (10th Cir. 2010) (unpublished) (court need not reach claims regarding ALJ's reliance on VE testimony, since such issues may be affected by treatment of the case on remand for further consideration) (citing *Robinson*, 366 F.3d at 1085). Accordingly, the Court will not address whether the record was sufficiently developed to allow the VE to determine Plaintiff's vocational limitations accurately.

### C.  The ALJ's Credibility Determination

The ALJ's determination that Plaintiff's testimony was "not entirely credible" is not tied to specific evidence, as is required. *See* Soc. Sec. Rep. 96-7p, 1996 WL 374186, at *4 ("reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision"). The few examples the ALJ gives are wholly insufficient to support a finding that

Plaintiff is capable of performing work "at any exertional level." Thus, the ALJ found that Plaintiff has only mild restriction in her activities of daily living, noting that she is "quite active despite her alleged symptoms and limitations." [*Doc. 17-3* at 16]. As evidence that Plaintiff's is "quite active," the ALJ noted that "[s]he is able to help with light household chores, such as laundry; she is able to pay bills, count change, handle bank accounts, help care for pets, use a computer, drive short distances, and care for her personal needs independently." *Id*. at 16-17. The ALJ found that these activities "clearly" support a finding that Plaintiff "has no more than **mild** restrictions in her activities of daily living." *Id*. at 17. On the other hand, Plaintiff testified that she does not usually drive unless she is going somewhere "extremely close and if I wake up feeling really good and optimistic." *Id*. at 38. She also testified that she "hardly do[es] anything anymore," including sweeping or vacuuming, grocery shopping, cooking, gardening, exercising, going to events or church, or getting together with friends, although she does do laundry. *Id*. at 38-39. When asked if she was "scared to exercise," Plaintiff replied that she is "afraid of everything," and is "afraid to raise [her] heart [rate] in any way, shape or form." *Id*. at 41. On a typical day, Plaintiff gets up around 6:30 a.m., takes a heart pill, goes to the kitchen to make a cup of coffee, and lets her dog out. *Id*. at 40. "[P]retty much the rest of the day I sit on the couch or I lay on my bed." *Id*. at 40. Plaintiff's primary care physician, Amy Schmidt, M.D., likewise noted, in a treatment record dated May 28, 2013, that Plaintiff "is definitely anxious," and "I think she has got generalized anxiety and talking to her I think there is certainly a fear of driving. There is fear of being in situations she cannot control and I am concerned that she is increasingly headed

towards agoraphobia." [*Doc. 17-19* at 13]. Dr. Schmidt also indicated that, although she had hoped to find an anxiolytic[15] that would be safe for Plaintiff to take every day, "honestly I think it would just add to her worry about the prolonged QT syndrome." *Id.*

In light of this evidence, the ALJ's findings that Plaintiff can dress herself, feed her dog, drive short distances occasionally, and do simple math hardly appear to indicate that her activity level does not support her claimed limitations, which are both physical and emotional. *See, e.g., Thompson*, 987 F.2d at 1490 ("sporadic performance of household tasks or work does not establish that a person is capable of engaging in substantial gainful activity"). While credibility determinations are considered "peculiarly the province of the finder of fact," such findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (citations and internal quotation marks omitted). Thus, an ALJ's credibility determination "cannot be based on an intangible or intuitive notion about an individual's credibility," rather, the "reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." Soc. Sec. Rep. 96-7p, 1996 WL 374186, at *4, *see also*, *Bright v. Astrue*, No. 08-1196-MLB, 2009 WL 1580308, at *5 (D. Kan. June 4, 2009) (unpublished) ("findings as to credibility should be closely and affirmatively linked to substantial evidence"). Here, the ALJ's credibility assessment relies on evidence that is superficial, selective, and not particularly relevant

---

[15]An anxiolytic is a drug that relieves anxiety. *See* Stedman's at 107.

to Plaintiff's functionality.[16] As a result, the assessment appears to be based on intangible factors rather than on evidence, and is more in the nature of a conclusion than a finding. The superficiality of the credibility determination also warrants remand.

## VI. Conclusion

For the reasons stated above, the Court **FINDS** that the Commissioner's decision should be remanded for further proceedings, including proper consideration of Plaintiff's RFC and the credibility of her subjective reports of impairments.

**IT IS THEREFORE ORDERED** that Plaintiff's *Motion to Reverse and Remand for a Rehearing, with Supporting Memorandum (Doc. 18)* is **GRANTED** and this case is **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order. A final order will be entered concurrently with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

*Lourdes A. Martinez*
**LOURDES A. MARTÍNEZ**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**

---

[16] Interestingly, however, Plaintiff testified that she would have continued working had she not gotten ill, and that she had not planned to retire after 25 years of service. [*Doc. 17-3* at 43]. However, in a December 2010 evaluation relating to her psychological fitness for gastric bypass surgery, Plaintiff told Elizabeth A. Penland, Ph.D. that "she hope[d] to retire at the end of 2011." [*Doc. 17-18* at 31]. The ALJ did not even mention this discrepancy. Therefore, in determining that Plaintiff lacked credibility, the ALJ apparently overlooked what may be the only record evidence that reflects negatively on Plaintiff's credibility.